Nos. 20-1016 & 20-1115

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

STATE OF WISCONSIN, Department of
Workforce Development – Division of
Vocational Rehabilitation,

       Plaintiff-Appellee,

  v.

BETSY DEVOS, et al.,

       Defendants-Appellees,

and

THERESA TAYLOR,

       Defendant-Appellant.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF WISCONSIN,
THE HONORABLE JAMES D. PETERSON, PRESIDING

**RESPONSE BRIEF OF APPELLEE STATE OF WISCONSIN,
DEPARTMENT OF WORKFORCE DEVELOPMENT – DIVISION OF
VOCATIONAL REHABILITIATION**

               JOSHUA L. KAUL
               Attorney General of Wisconsin

               STEVEN C. KILPATRICK
               Assistant Attorney General
               State Bar #1025452

               Attorneys for State of Wisconsin DWD

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792
(608) 267-2223 (Fax)
kilpatricksc@doj.state.wi.us

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................1

INTRODUCTION ............................................................................1

ISSUES PRESENTED FOR REVIEW .........................................4

STATEMENT OF THE CASE .........................................................5

I.     The Randolph-Sheppard Act; Wisconsin's participation in the program; key players........................5

II.    Statement of facts and procedural history. ...................7

     A.    Racine Correctional Institution/Sturtevant Transitional Facility and the Racine Youthful Offender Correctional Facility. .............................7

     B.    2011 interviews. ...................................................9

     C.    Taylor's grievance and the state hearings.......... 10

     D.    DWD's final decision on Taylor's grievance. ...... 12

     E.    Taylor's appeal to the Department. ................... 13

     F.    The Elected Committee of Blind Vendors and the new interview criteria. ................................. 14

     G.    2013 interviews. ................................................. 15

     H.    The federal arbitration panel hearing. .............. 17

     I.    The federal district court proceedings. .............. 20

         1.    Procedural history. ................................. 20

         2.    The district court decision. ....................... 20

             a.    Foundational problems with the arbitration panel's decision. ............................. 21

Page

        b.    Problems with the arbitration
              panel's substantive rulings.............................. 21

              (1)    Use of 2013 business data in
                        the 2013 interviews................................ 23

              (2)    Greco's decision not to accept
                        letters of recommendation..................... 25

              (3)    Greco's decision not to make
                        Taylor the interim operator
                        of the RCI/STF site. .............................. 26

              (4)    Delay between Greco's
                        decision and the 2013
                        interview................................................. 27

        c.    The arbitration panel's conclusions
              were arbitrary and remedies were
              improper. ........................................................ 28

        d.    The district court's remedies. ........................... 29

SUMMARY OF THE ARGUMENT .................................................. 30

STANDARD OF REVIEW ................................................................ 31

ARGUMENT ..................................................................................... 32

   I.    The district court properly set aside the decision of
       the federal arbitration panel. ......................................... 32

      A.    The ad hoc arbitration panel gave itself
           authority it did not possess. ................................. 32

      B.    The arbitration panel erred in setting Taylor's
           burden of proof as substantial evidence rather
           than preponderance of the evidence. ................... 35

      C.    The panel's key findings of fact are not
           supported by substantial evidence..................... 39

          1.    The substantial evidence standard........................... 39

Page

2.  The panel's finding that DWD was biased against Taylor is not supported by substantial evidence. ................................ 40

3.  The panel's finding that Taylor was disadvantaged by the 2013 selection criteria is not supported by substantial evidence. ................................ 41

4.  The panel's finding that Taylor's letter of recommendation would have had a significant effect on the permanent contract award process is not supported by substantial evidence. ........................... 44

5.  The panel's findings regarding the delay between Greco's decision and the 2013 re-interviews, and alleged consequential harm to Taylor, are not supported by substantial evidence. ................................ 45

D.  The panel's conclusions are arbitrary and capricious. ................................ 47

1.  Arbitrary and capricious standard. ........................ 47

2.  The panel's conclusions that Taylor was the best-suited operator for the RCI/STF site and to replace Belsha with Taylor were arbitrary and capricious. ................................ 47

II.  Alternatively, the State of Wisconsin is immune from the arbitration panel's monetary damages awards. ................... 50

CONCLUSION ................................................. 57

# TABLE OF AUTHORITIES

## Cases

*Alden v. Maine,*
   527 U.S. 706, (1999) ........................................................ 51

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
   421 U.S. 240 (1975) ........................................................ 57

*Berron v. Illinois Concealed Carry Licensing Review Bd.,*
   825 F.3d 843 (7th Cir. 2016) ............................................ 36

*Broecker v. Sullivan,*
   751 F.Supp. 1361 (W.D. Wis. 1990) .................................. 38

*Brown v. Ill. Dep't of Human Servs.,*
   717 F. App'x 623 (7th Cir. 2018) .................................... 6–7

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) .......................................................... 57

*College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,*
   527 U.S. 666 (1999) ........................................................ 52

*Comm. Of Blind Vendors v. District of Columbia,*
   736 F. Supp. 292 (D.D.C. 1990) ...................................... 46

*Delaware Dep't of Health & Soc. Servs., Div. for Visually Impaired v. U.S.
   Dep't of Educ.,*
   772 F.2d 1123 (3d Cir. 1985) .......................................... 56

*Federal Maritime Comm'n v. South Carolina Ports Authority,*
   535 U.S. 743 (2002) ........................................................ 51

*Gotham Holdings, LP v. Health Grades, Inc.,*
   580 F.3d 664 (7th Cir. 2009) ........................................... 34

*Hale v. Victor Chu,*
   614 F.3d 741 (7th Cir. 2010) ........................................... 50

*Hans v. Louisiana,*
   134 U.S. 1 (1890) ............................................................ 51

Page

*Lane v. Peña,*
  518 U.S. 187 (1996) ............................................... 53

*Maryland State Dept. of Education v. United States Dept. of Education,* Case
  No. CCB-17-1383, 2,
  018 WL 4604305 (Sept. 25, 2018) ............................. 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................... 34, 47

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ......................................... 47, 48

*New Hampshire v. Ramsey,*
  366 F.3d 1 (1st Cir. 2004) ..................................... 56

*Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries,*
  512 U.S. 267 (1994) ......................................... 36, 49

*Pennhurst State School and Hospital v. Halderman,*
  465 U.S. 89 (1984) .......................................... 51–52

*Premo v. Martin,*
  119 F.3d 764 (9th Cir. 1997) ................................... 56

*Rapanos v. United States,*
  547 U.S. 715 (2006) ............................................ 24

*Sea Island Broadcasting Corp. v. FCC,*
  627 F.2d 240 (D.C. Cir. 1980) .................................. 36

*Seminole Tribe of Fla. v. Florida,*
  517 U.S. 44 (1996) ............................................. 51

*Sossamon v. Texas,*
  563 U.S. 277 (2011) .....................................51, *passim*

*Stachan Shipping Co. v. Shea,*
  276 F. Supp. 610 (S.D. Tex. 1967) ............................. 38

*Steadman v. SEC,*
  450 U.S. 91 (1981) ............................................. 36

*Tyler v. United States Dep't of Educ. Rehab. Servs. Admin.,*
  904 F.3d 1167 (10th Cir. 2018) ..........................5, *passim*

*United States v. James Daniel Good Real Prop.,*
   510 U.S. 43 (1993) ................................................... 34

*United States v. Nordic Village, Inc.,*
   503 U.S. 30 (1992) ................................................... 53

*Whitney v. Schweiker,*
   695 F.2d 784 (7th Cir. 1982) ...................................... 38

*Wisconsin Dep't of Workforce Dev. v. United States Dep't of Educ.,*
   667 F. Supp. 2d 1007 (W.D. Wis. 2009) .......................... 29, 54–55

*Zero Zone, Inc. v. United States Dep't of Energy,*
   832 F.3d 654 (7th Cir. 2016) ...................................... 39

**Statutes**

5 U.S.C. § 556(d) ......................................................35, *passim*

5 U.S.C. § 706....................................................... 6, 31

5 U.S.C. § 706(2)(A), (B), and (E) .................................... 31

5 U.S.C. § 706(2)(C) ................................................. 35

5 U.S.C. § 706(2)(D) ................................................. 39

5 U.S.C. § 706(2)(e) ................................................. 38

20 U.S.C. § 107....................................................... 1

20 U.S.C. §§ 107a(a), 107(b) ......................................... 5

20 U.S.C. §§ 107d-1(a), 107d-2 ...................................... 6

20 U.S.C. § 107d-2(a) ................................................ 31

Wis. Stat. § 47.03 ................................................... 6

**Regulations**

34 C.F.R. § 395.13 ................................................... 6

34 C.F.R. §§ 395.4, 395.3(a)(7), 395.1(g), (n), and (p)............... 5

Wis. Admin. Code DWD ch. 60.......................................... 6, 15

Wis. Admin. Code DWD § 60.03(1), (5)(a) & (c) ....................... 7, 45

Page

Wis. Admin. Code DWD §§ 60.02(5), 60.03 ................................................... 6–7

Wis. Admin. Code DWD § 60.05(3) ........................................................... 10, 12

Wis. Admin. Code DWD § 60.07(2) ................................................................ 22

Wis. Admin. Code DWD § 60.08........................................................10, *passim*

# JURISDICTIONAL STATEMENT

The jurisdictional statement of Defendant-Appellant Theresa Taylor is complete and correct.[1]

# INTRODUCTION

This case has a long and convoluted administrative history, but the end result in the district court was proper: the court set aside the decision of a federal ad hoc arbitration panel, convened by the U.S. Department of Education, against Appellee State of Wisconsin and in favor of Appellant Theresa Taylor, because its factual findings are not supported by substantial evidence and its conclusions are arbitrary and capricious.

The Randolph-Sheppard Vending Stand Act, 20 U.S.C. §§ 107 *et seq*. ("the RSA"), provides employment opportunities for the blind by granting them priority in the operation of vending facilities on federal and state property. The State of Wisconsin, Department of Workforce Development - Division of

---

[1] Taylor filed her first notice of appeal after the original judgment was entered. (Dkt. 38.) This Court assigned case no. 20-1016 to this appeal. After the district court issued an amended judgment, Taylor filed an amended notice of appeal after the amended judgment was entered. (Dkt. 43.) This Court assigned case no. 20-1115 to that appeal. Per an order of this Court (7th Cir. (20-1016) Dkt. 3), Taylor filed a jurisdictional memorandum (7th Cir. (20-1016) Dkt. 6). On January 22, 2020, this Court consolidated the two appeals were for purposes of briefing and disposition. (7th Cir. (20-1016) Dkt. 7.) The State of Wisconsin does not question Taylor's conclusion that this Court has jurisdiction to hear her appeals.

Vocational Rehabilitation ("the State" or "DWD") voluntarily participates as a state licensing agency (SLA) in the RSA program.

Theresa Taylor was an interim operator for the vending facilities at Racine Correctional Institution and Sturtevant Transitional Facility ("RCI/STF" or the "combined facilities") beginning in 2007. The combined facilities were set to be bid out for selection of a permanent operator as a stand-alone facility in October 2011. Taylor and other blind vendors, including Joelyn Belsha (who trained Taylor), participated in the bid award selection process for the permanent contract. Belsha was awarded the contract. Taylor, dissatisfied, filed a grievance with DWD, eventually taking her case to a full evidentiary hearing before state-appointed officials. This hearing panel concluded that DWD violated its own policies and made recommendations for change: that the selection process take place again, with the candidates being re-interviewed with, among other things, new questions and benchmarks.

In a final agency decision, DWD implemented almost all of those recommendations. In particular, the selection process for the RCI/STF site was to occur again. But Taylor took issue with the fact that DWD decided to use current profitability numbers of the blind vendors as one factor at the re-interviews. She also took issue with DWD's decision to keep Belsha on as interim vendor during the reconstituted selection process.

2

Taylor, still dissatisfied, filed a complaint against DWD with the Secretary of the U.S. Department of Education (the "Department").

In the meantime, the bid award process commenced in June 2013 under the new selection criteria. Belsha and other candidates participated in this process, but Taylor refused the interview. Taylor believed that the 2013 process was unfair to her because it would not use 2011 profitability data, which she believed was better for her chances to obtain the contract. Without Taylor's participation, the permanent contract for the RCI/STF site was eventually awarded to Belsha.

Taylor then amended her complaint to the Department to add her charges about the 2013 process and the contract being awarded to Belsha. In June 2015, the Secretary of the Department authorized the convening of an ad hoc arbitration panel. Each party selected a panel member, but the third panel member was not appointed by the Department until March 2017. An evidentiary hearing took place between Taylor and DWD in September 2017. In early 2018, the panel, in a 2-1 decision, found in favor of Taylor, holding that the process for the RCI/STF site was unfair and biased against her. As a remedy, it arrogated itself the authority to remove Belsha as holder of the permanent contract and award it to Taylor instead. Going further, the panel awarded Taylor compensatory damages for lost profits, costs, and attorney's fees—to be paid by the State of Wisconsin.

3

DWD filed with the district court a petition for judicial review of the arbitration panel's decision under the Administrative Procedures Act (APA). In December 2019, the court vacated and reversed the panel's decision. It concluded that its key factual findings—e.g., that DWD was biased against Taylor, and that she was disadvantaged by the decision to use 2013 profitability data to evaluate the candidates for the RCI/STF site—were not supported by substantial evidence. The court further held that the panel's conclusions—e.g., removing Belsha and installing Taylor as permanent operator for the RCI/STF site, when Taylor did not participate in the 2013 re-interviews—were arbitrary and capricious.

Because the district court's decision was correct, and Taylor's brief fails to show that it wasn't, this Court should affirm.

## ISSUES PRESENTED FOR REVIEW

I.  Should the federal ad hoc arbitration panel's decision in favor of Taylor and against the State for violations of the RSA be set aside, as the district court decided, because its key factual findings are not supported by substantial evidence and its conclusions are arbitrary and capricious?

This Court should answer yes.

II. Is the federal arbitration panel's monetary damages award against the State of Wisconsin barred by sovereign immunity, as the district court alternatively decided, because the RSA does not contain unequivocal language

that would allow the states to knowingly waive their immunity when choosing to participate in the RSA Program?

This Court should answer yes.

## STATEMENT OF THE CASE

### I.     The Randolph-Sheppard Act; Wisconsin's participation in the program; key players.

The Randolph-Sheppard Act, "enacted in 1936 and amended in 1954 and 1974, established a federal program (the 'RSA Program') to enhance blind individuals' economic opportunities by granting them priority to operate vending facilities on federal property." *Tyler v. United States Dep't of Educ. Rehab. Servs. Admin.*, 904 F.3d 1167, 1170–71 (10th Cir. 2018). "States participate in the RSA Program through state licensing agencies ('SLAs') designated by the [United States Department of Education ('the Department')], which administers the RSA." *Id.* at 1171 (citing 20 U.S.C. §§ 107a(a), 107(b)). "SLAs promulgate and implement policies and standards, which [the Department] must approve, governing the licensure and selection of blind vendors to operate vending facilities on federal property" and other property. *Tyler*, 904 F.3d at 1171; 34 C.F.R. §§ 395.4, 395.3(a)(7), 395.1(g), (n), and (p).

"[T]he RSA establishes a two-tiered scheme for resolving blind vendors' grievances arising from SLAs' operation of the RSA program. First, SLAs must hear and render a decision on a blind vendor's grievance." *Tyler*, 904 F.3d

at 1171; 20 U.S.C. §§ 107d-1(a), 107d-2; 34 C.F.R. § 395.13. "Second, a vendor who is dissatisfied with the SLA's decision may then request arbitration by a panel convened by [the Department]". *Id.* Decisions of the arbitration panel are final agency actions subject to judicial review in federal court as under the APA. *Id.*; 20 U.S.C. §§ 107d-1(a), 107d-2(a); 5 U.S.C. § 706; 34 C.F.R. § 395.13. *See also Brown v. Ill. Dep't of Human Servs.*, 717 F. App'x 623, 624 (7th Cir. 2018).

The Wisconsin Department of Workforce Development - Division of Vocational Rehabilitation ("DWD" or "the State") is an SLA designated to administer the RSA Program through its business enterprise program (BEP).[2] *See* Wis. Stat. § 47.03; Wis. Admin. Code DWD chapter 60.

Appellant Theresa Taylor is a licensed blind vendor who operates vending facilities on federal and state property under the RSA Program in Wisconsin.[3] Joelyn Belsha is also a licensed blind vendor operator in Wisconsin. Belsha trained Taylor when Taylor first participated in the program.[4]

The Elected Committee of Blind Vendors is a group of existing operators who are elected by the whole group of operators. Wis. Admin. Code DWD

---

[2] Dkt. 21-1:19–20 (AR-000142:17–AR-000143:4). The agency record ("AR") was bates stamped prior to filing with the district court. These bates numbers appear in the lower right corner of each page of the record.
[3] Dkt. 21-1:19 (AR-000142:17–25).
[4] Dkt. 21-1:23 (AR-000146:24 – AR-000147:7).

§§ 60.02(5), 60.03. Its role is to actively participate[5] with DWD on program administration of the BEP.[6] *Id.* The Elected Committee and DWD make major administrative decisions and policy and program development decisions affecting the overall administration of the BEP. Wis. Admin. Code DWD § 60.03(1), (5)(a) & (c).

## II.    Statement of facts and procedural history.

### A.    Racine Correctional Institution/Sturtevant Transitional Facility and the Racine Youthful Offender Correctional Facility.

Taylor was first appointed as a licensed blind vendor in 2006 to operate the Southern Wisconsin Center, which consists of veteran facilities, cognitively disabled facilities, and the Ellsworth Correctional Center.[7] In October 2007, she was asked to be the interim operator of the Racine Correctional

---

[5] Active participation is defined as:

> a formal, ongoing process involving the mutual exchange of information and advice in regard to planning and review of proposed program policies, standards and procedures, with the understanding that only the department has the responsibility to administer the program consistent with applicable statutes, regulations and this chapter, and that the right of the committee to actively participate does not affect that responsibility.

Wis. Admin. Code DWD § 60.02(1). (*See also* Dkt. 21-3:1 (AR-000768).)

[6] Dkt. 21-1:159–60 (AR-000282:23–25 – AR-000283:1–2).
[7] Dkt. 21-1:20–21 (AR-000143:22–25 – AR-000144:1).

7

Institution/Sturtevant Transitional Facility (RCI/STF or "combined facilities") and the Racine Youthful Offender Correctional Facility (RYOCF).[8]

An interim operator takes on the site knowing that it is not permanent and that DWD could decide to bid it out or transfer the site to another operator at any point.[9] Taylor operated the RYOCF and RCI/STF sites for four years on an interim basis.[10]

In July 2011, DWD sent notice to all operators of a bid announcement for the RYOCF site as an add-on site.[11] In August, DWD sent the bid notice to all operators for the RCI/STF facilities as a stand-alone permanent site.[12]

A stand-alone site is large enough to provide an employment opportunity for one operator. Operators who bid on a stand-alone site do so with the knowledge that the operator will give up her existing sites because the stand-alone is large enough to provide successful employment for the operator.[13] An add-on site is typically a smaller site that does not provide enough employment opportunity on its own for an operator. An add-on site is added to an operator's existing sites.[14] The profitability of the site determines

---

[8] Dkt. 21-1:21–22 (AR-000144:7–25; AR-000145:9–16).
[9] Dkt. 21-1:112 (AR-000235:6–17).
[10] Dkt. 21-1:22–23 (AR-000145:21–25 – AR-000146:1–2).
[11] Dkt. 21-1:213–14 (AR-000336–37).
[12] Dkt. 21-1:219 (AR-000342).
[13] Dkt. 21-1:113 (AR-000236:14–25).
[14] Dkt. 21-1:114 (AR-000237:1–4).

whether a site or group of sites is a stand-alone versus an add-on site. This determination is made with active participation from the Elected Committee.[15]

## B.    2011 interviews.

In 2011, Taylor interviewed for the RYOCF site and scored 110 points.[16] Belsha also interviewed and scored 104 points.[17] Greg Feypel, from the BEP, was on the interview panel.[18] Based on the notes from Belsha's and Taylor's interviews for the RYOCF site, Feypel gave Belsha and Taylor the same score of 40 points.[19] Taylor was awarded the RYOCF site.[20]

Taylor, Belsha, and two other operators, also bid on the RCI/STF site.[21] DWD advised Taylor that she could use her score from the RYOCF interview, or she could choose to re-interview.[22] Interviews for the RCI/STF site took place in October 2011.[23] Taylor brought a letter of recommendation to the interview for the combined facilities.[24] She wanted the letter read to the vendors who were scoring her at the interview, but it was not considered.[25] Taylor scored

---

[15] Dkt. 21-1:114 (AR-000237:9–21).

[16] Dkt. 21-1:40 (AR-000163:16–22).

[17] Dkt. 21-1:289 (AR-000412).

[18] Dkt. 21-1:289 (AR-000412).

[19] Dkt. 21-1:289 (AR-000412).

[20] Dkt. 21-1:222 (AR-000345).

[21] Dkt. 21-1:289, 300 (AR-000412; AR-000423).

[22] Dkt. 21:93 (AR-000093).

[23]  Dkt.  21-1:23,  35,  39,  253–260  (AR-000146:11–15;  AR-000158:1–5;  AR-000162:16–18; AR-000375–83).

[24] Dkt. 21-1:34–36 (AR-000157:10 – AR-000159:5).

[25] Dkt. 21-1:35–36, 291 (AR-000158:22 – AR-000159:5; AR-000414).

96 points.[26] Belsha scored 101 points.[27] Belsha was awarded the permanent contract for the RCI/STF site.[28]

### C.    Taylor's grievance and the state hearings.

Taylor filed a grievance contesting the selection of Belsha as the permanent operation of the RCI/STF site.[29] Kim Pomeroy, the BEP Director at the time, held a grievance hearing in November 2011. Taylor complained that, because DWD did not consider the letter of recommendation, it did not select "the licensee deemed to be best suited for an available business enterprise" as required by Wis. Admin. Code DWD § 60.08. Two weeks later Pomeroy issued her decision denying Taylor's grievance.[30]

In December 2011, Taylor appealed the denial of her grievance.[31] In accordance with the RSA and Wis. Admin. Code DWD § 60.05(3), a full evidentiary hearing was held—in early May 2012.[32] At the hearing, Taylor testified that Feypel contacted her in August 2011 to discuss the combined facilities bid. Taylor said Feypel expressed the thought of giving Belsha the combined facilities because Belsha's University of Wisconsin-Parkside location

---

[26] Dkt. 21-1:40–41 (AR-000163:25 – AR-000164:4).
[27] Dkt. 21-1:278–87 (AR-000401–08, 410.)
[28] Dkt. 21-1:142 (AR-000266:3–5).
[29] Dkt. 21-1:291–92 (AR-000414–15).
[30] Dkt. 21-1:294–95 (AR-000417–18).
[31] Dkt. 21-1:297 (AR-000420).
[32] The hearing was recorded; however, the audio recording was too poor to transcribe. (Dkt. 21-1:51–52 (AR-000174–75).

wasn't profitable and it would even things out.[33] At the hearing, Feypel denied saying DWD would take a site away from Taylor. He testified that his conversation with Taylor was just trying to explain the "stand-alone" versus "add-on" site distinction.[34]

The full evidentiary hearing panel determined that the RCI/STF site interviews were not conducted in accordance with written procedure that DWD established and the Elected Committee approved. The interview process ignored the December 3, 2010 policy and procedure for selecting a site operator because: (1) the RCI site facilities manager Redd, or his designee, was not on the interview panel; (2) the panel did not accept Taylor's letter of recommendation; (3) the selection was based solely on the interview score, whereas the procedure said scores would be considered as part of the selection process; and (4) there was no evidence presented of a written recommendation with justification for Belsha's selection made to the BEP Director.[35] And the panel found that DWD might have considered factors outside the ambit of selecting the best-suited candidate, particularly managing profitability based on social need.[36] In short, this panel found that the selection of Belsha was not

---

[33] Dkt. 21-1:300 (AR-000423).
[34] Dkt. 21-1:302 (AR-000425).
[35] Dkt. 21-1:302 (AR-000425).
[36] Dkt. 21-1:303 (AR-000426).

adequately justified under Wis. Admin. Code DWD § 60.08.[37]     At the end of May 2012, the panel recommended that DWD: (1) set aside the selection of Belsha as permanent operator for RCI/STF; (2) give all four candidates an opportunity to interview again with an entirely different panel comprised in compliance with the selection policy and with total disregard of the prior interviews and scores; (3) prepare new interview questions and benchmarks, including at least one question tailored to the specific facility involved to determine each candidate's ability to meet the physical requirements and each candidate's relevant past experience; (4) adhere to other items in the selection procedure, including accepting resumes and references if offered by a candidate and consideration of relevant factors other than the interview scores; (5) require the interview panel to submit a written recommendation to DWD with justification; and (6) select the candidate in accordance with this recommendation who is best suited for that business enterprise, regardless of the candidate's need or the otherwise acceptable objective of evening-out sites among operators.[38]

### D.     DWD's final decision on Taylor's grievance.

In accordance with Wis. Admin. Code DWD § 60.05(3), the (acting) Division Administrator, Michael Greco, received the aforementioned recommendations.

---

[37] Dkt. 21-1:299–303 (AR-000422–26).
[38] Dkt. 21-1:303 (AR-000426).

In June 2012, after giving consideration to the record of the hearing and the panel's recommendations, he issued a final agency decision on Taylor's grievance.[39] Greco ordered that: (1) BEP staff will conduct a new interview process to decide on the permanent operator for the RCI/STF site; (2) the same four candidates will be invited to interview with a new panel, comprised in accordance with BEP policy and with no reference to the previous interviews and scores; (3) the interviews will use new questions and benchmarks, and will include one question related to the specific facilities involved; (4) BEP staff shall ensure that all candidates are told that resumes and references are not to be submitted during the selection process or brought to the interview; and (5) interview panel members will submit a written recommendation on the selection of the RCI/STF operator, with an explanation on the basis of the interview questions, the benchmarks, and the qualifications of the candidates. Greco also ordered that Belsha would continue as the interim RCI/STF site operator during the new selection process.[40]

### E.    Taylor's appeal to the Department.

On July 23, 2012, Taylor filed a complaint with the Department seeking an arbitration panel hearing. She alleged that DWD discriminated and retaliated against her, and she asked that she be placed as permanent operation of the

---

[39] Dkt. 21-1:306 (AR-000429).
[40] Dkt. 21-1:306 (AR-000429).

RCI/STF site and receive financial compensation for lost revenue.[41] In May 2013, the Department acknowledged receipt of Taylor's complaint, and also notified Greco about Taylor's complaint and that it was being reviewed.[42]

### F.    The Elected Committee of Blind Vendors and the new interview criteria.

In the meantime, DWD formulated new interview questions and benchmarks for selecting best-suited operators for stand-alone sites.[43] DWD sought review and comment from the Elected Committee of Blind Vendors at a meeting in November 2012.[44] Taylor was invited to that meeting where the proposed criteria was provided to all the operators for their review.[45] In March 2013, DWD and the Elected Committee jointly approved the procedure for the selection of the best-suited licensee for an available BEP location. The procedure went into effect on April 1, 2013.[46]

The new selection criteria had several scoring components: (1) a testing component of 15 questions, 2 points each, worth 30 points; (2) an interview with 5 questions, each worth 5 points, for a total of 25 points; (3) a performance

---

[41] Dkt. 21:1–3 (AR-000001–3).
[42] Dkt. 21:4–7 (AR-000004–7).
[43] Dkt. 21-2:116–121 (AR-578–83).
[44] Dkt. 21-1:111, 130, 150–51 (AR-000234:1–7; AR-000253:5–19; AR-000273:25; AR-000274:1–6).
[45] Dkt. 21-1:159 (AR-000282:13–19).
[46] Dkt. 21-1:315–16 (AR-000438-39).

review consisting of 6 questions with different scoring ranges, worth a total of 45 points.[47] Thus, a perfect score would be 100 points.

This new selection criteria procedure was also submitted to the Rehabilitation Services Administration with the Department, which acknowledged receipt of the new procedure.[48]

### G.    2013 interviews.

On June 18, 2013, DWD invited Taylor to re-interview, along with Belsha and the other two candidates, for the RCI/STF site. Taylor's interview was set for June 27.[49]

On June 25, Taylor emailed Lorie Lange, the current BEP director. Taylor asked for a detailed outline of how the interview would be administered and how the points would be awarded and calculated. She also asked whether the candidates would be interviewed using their business status based on the original date of the RCI/STF interview. Lange responded and attached a copy of the interview process that had previously been sent to all operators in March. Lange told Taylor to contact Ralph Mikell with any more questions.

---

[47] Dkt. 21-1:308–10 (AR-000431–33).
[48] Dkt. 21-1:130 (AR-000253:5–19). DWD did not believe it needed approval of the federal Rehabilitation Services Administration for the procedure related to selection of operators. If there is a major change in policy, such as amending the Wisconsin Administrative Code Chapter DWD 60, then DWD would need approval. The interview process was not a major change in policy. Dkt. 21-1:174–75 (AR-000297:1 – AR-000298:7).
[49] Dkt. 21-2:110–11 (AR-000572–73).

Taylor emailed Mikell asking for clarification on the data used to calculate the points, i.e., whether it would be the current data or from 2011.[50] Mikell responded that current data would be used in part in factoring the overall scores.[51]

On June 26, Taylor emailed Mikell and Lange to inform them that she would not be attending the re-interview due to her pending appeal. She also indicated that she felt the re-interview was unethical and did not follow the hearing panel's decision. Taylor said it was unacceptable to conduct a re-interview for a site, bid out 2 years ago, based on operators' current business status.[52]

Belsha and the other candidates re-interviewed under the new policy. Belsha was selected as the best-suited permanent operator for the RCI/STF stand-alone site.[53]

In July 2013, Greco provided a status update to the Department regarding Taylor's grievance. Greco indicated that his June 12, 2012, final decision on Taylor's grievance directed the BEP to conduct a new interview process to decide on the permanent operator for the combined facilities. He also reported that DWD and the Elected Committee jointly approved the procedure for the

---

[50] Dkt. 21-2:113 (AR-000575).
[51] Dkt. 21-2:113–14 (AR-000574–75).
[52] Dkt. 21-2:112 (AR-000574).
[53] Dkt. 21-1:162 (AR-000285:14-19).

selection of the best-suited licensee. He further stated that, before the procedure was approved, all the licensees were given the opportunity to review the procedure and criteria and, upon approval, all licensees were informed and sent a copy of the final procedure. Greco also wrote that Taylor was invited to re-interview for the combine facilities, along with the other three operators who originally interviewed, but she declined.[54]

### H.     The federal arbitration panel hearing.

Taylor filed an amended complaint with the Department in October 2013, expanding the scope of her original complaint to incorporate objections to the 2013 re-interview process–specifically that DWD would evaluate candidates based on current business data instead of data from 2011.[55]

In July 2015, the Department gave notice to Taylor and DWD that the Secretary authorized the convening of an ad hoc (three-member) arbitration panel to hear and render a decision on Taylor's amended complaint.[56] DWD and Taylor selected members to the ad hoc arbitration panel per the RSA.[57]

---

[54] Dkt. 21-2:114–15 (AR-000576–77).
[55] Dkt. 21:8–20 (AR-00008–20).
[56] Dkt. 21-1 (AR-000457–58).
[57]  Dkt. 21:117 (AR-000117).

Eventually, after the Department appointed its member, the arbitration evidentiary hearing was held on September 26, 2017, in Madison, Wisconsin.[58] The issues were as follows:

> 1. Did the [DWD] act in an arbitrary, capricious and biased manner by failing to follow its rules, regulations, policies and procedures when it selected a permanent operator for the RCI/STF business site and/or by failing to place Theresa Taylor as permanent operator for RCI/STF thereby violating the Randolph-Sheppard Act, implementing regulations, state rules, regulations, policies and procedures?
>
> 2. If so, what is the appropriate remedy?[59]

The panel issued a written decision in early 2018.[60] A two-member majority concluded that DWD had "arbitrarily, capriciously and in a biased manner failed to award Taylor the RCI/STF site during the two selection processes."[61] One panel member dissented.[62] (Dkt. 34:10.)

The panel held that the 2011 interviews had not been conducted in accordance with DWD policies and procedures, and that "consequently the [initial] selection of Belsha was not adequately justified" under Wis. Admin. Code DWD § 60.08.[63] The panel agreed with the results of the state full

---

[58] Dkt. 21:117 (AR-000117);  21-1:2 (AR-000125).

[59] Dkt. 21-3:61 (AR-000828).

[60] Dkt. 21-3:60–90 (AR-000827–57) (majority opinion). The two majority panel members signed the decision at different dates in January and February 2018. Dkt. 21-3:89–90 (AR-000856–57).

[61] Dkt. 21-3:68 (AR-000835).

[62] Dkt. 21-3:91–98 (AR-000858–65).

[63] Dkt. 21-3:76 (AR-000843).

evidentiary hearing, concluding that the recommendations "should have been followed in their entirety."[64] (Dkt. 34:10.)

Also, the panel found flaws with DWD's process after the full evidentiary hearing. The panel concluded that Greco was arbitrary and capricious in not accepting resumes and references at the re-interviews[65] and in allowing Belsha to serve as the interim operator of the RCI/STF site during the re-constituted selection process.[66] The panel further found that it was unfair to Taylor to use profitability data from 2013, instead of from 2011.[67] Finally, it faulted the 2013 interviews because of "the year plus delay between [the] decision of the acting DVR administrator to order a new interview process and the date the new interview took place."[68] In the end, the panel concluded that DWD had violated the requirement—per Wis. Admin. Code DWD § 60.08— that it select the best-suited operator.[69] (Dkt. 34:10.)

Then, the panel went further, determining for itself that Taylor was the best-suited operator for the RCI/STF site and that she should have been selected (despite not participating in the 2013 re-interviews). It found that DWD had demonstrated "bad faith throughout this matter" and that "Taylor

---

[64] Dkt. 21-3:79 (AR-000846).
[65] Dkt. 21-3:81–82 (AR-000848–49).
[66] Dkt. 21-3:80 (AR-000847).
[67] Dkt. 21-3:83 (AR-000850).
[68] Dkt. 21-3:83 (AR-000850).
[69] Dkt. 21-3:84 (AR-000851).

must be made whole by making her the permanent operator at the RCI/STF site."[70] The panel awarded Taylor compensatory damages at the rate of $105.38 per day from the date Belsha was installed as operator until the date when Taylor is installed, along with her legal fees and costs. [71] (Dkt. 34:10.)

## I.   The federal district court proceedings.

### 1.   Procedural history.

DWD filed a petition for judicial review of the arbitration panel's decision on March 28, 2018, naming Taylor and the Secretary of the Department as respondents. (Dkt. 1.) On August 29, 2018, the Department filed the administrative agency record. (Dkt. 21.)

DWD filed a motion and brief in support of its petition for review on November 13, 2018. (Dkt. 26.) On that same day, Taylor filed her own brief in support of a motion for confirm and enforce the arbitration decision. (Dkt. 24–25.) DWD and Taylor, but not the Department, proceeded with and completed briefing in December 2018. (Dkt. 27–30.)

### 2.   The district court decision.

The district court issued its decision on December 3, 2019, vacating and reversing the arbitration panel's decision. (Dkt. 34.)

---

[70] Dkt. 21-3:88 (AR-000855).
[71] Dkt. 21-3:88 (AR-000855).

### a. Foundational problems with the arbitration panel's decision.

The court initially concluded that there were two foundational problems with the panel's decision. First, the panel impermissibly granted itself broad authority: performing a re-do of the bid award process, awarding the permanent contract to Taylor, and removing the contract awarded to Belsha, all without any other bidder's participation. The panel failed to consider this "important aspect of the problem," leading the court to consider the panel's decision arbitrary and capricious. (Dkt. 34:13–14.) Second, the court concluded that the panel applied the wrong burden of proof, requiring Taylor merely to prove her case by substantial evidence rather than preponderance of the evidence. (Dkt. 34:14.)

### b. Problems with the arbitration panel's substantive rulings.

As to the panel's substantive rulings, the court concluded that they were "unsound." (Dkt. 34:16.)

The court criticized the panel's finding that DWD displayed consistent bias against Taylor. First, not only did the panel not explain what that consistent bias was—other than a string cite to Feypel's testimony—but it did not mention Lorie Lang's testimony on DWD's policies on temporary assignments

and promotions and transfers, that rebutted the idea that DWD considered "social need" in awarding vending contracts.[72] (Dkt. 34:16–17.)

Second, the court concluded that DWD regulations "undercut the panel's conclusions that Feypel's consideration of Belsha's declining income can be explained only as unfair bias against Taylor." (Dkt. 34:17.) For instance, Wis. Admin. Code DWD § 60.07(2) allows an operator faced with declining sales for reasons beyond her control to request a transfer to another location, and such vendor is entitled to preference in selection for future vacancies under Wis. Admin. Code DWD § 60.08(3). (Dkt. 34:17.[73])

Third, the court concluded that the record as a whole did not show consistent bias against Taylor. For example, Feypel scored Taylor and Belsha exactly the same in the 2011 interviews and awarded the RYOC site to Taylor.[74] (Dkt. 34:17.)

Fourth, and most importantly, the court held that even if Feypel was biased against Taylor, it was wiped-away by the 2013 re-interviews without his participation. The court explained that DWD substantially sustained Taylor's grievance after the full evidentiary hearing; it implemented a "re-do" of the selection process using new criteria. Because that hearing addressed Taylor's

---

[72] Dkt. 21-1:30–31 (AR-000153–54).
[73] The court acknowledged that DWD did not make this argument. (Dkt. 34:17.)
[74] Dkt. 21-1:289 (AR-000412).

grievance, whatever occurred before, including Feypel's statements, "should have been immaterial." (Dkt. 34:17–18.)

The district court then addressed what the arbitration panel found to be four specific deficiencies in DWD's implementation of the full evidentiary hearing panel—the relevant factual findings in this case. The court found that "[n]one is supported by substantial evidence." (Dkt. 34:18.)

### (1)    Use of 2013 business data in the 2013 interviews.

The arbitration panel concluded that Taylor was disadvantaged compared to Belsha in answering questions about profit margins because Taylor's margins in 2013 were lower than they would have been in 2011 when she was interim operator of the RCI/STF site–since, according to Taylor, prison sites are more profitable.[75] The panel said Taylor should have been evaluated based on her 2011 profitability data. The district court concluded that the panel's finding that Taylor would have been disadvantaged is not supported by substantial evidence. (Dkt. 34:18.)

The only aspects that assessed the applicant's profitability data were the fifth and sixth questions in the performance review section of the 2013 selection criteria.[76] (Dkt. 34:18.) Hence, to the court, the differences in profit

---

[75] Dkt. 21-3:83 (AR-000850).
[76] Dkt. 21-1:310 (AR-000433).

margins would have had minimal impact on the candidates' scores. (Dkt. 34:18–19.) More importantly, the court found no evidence in the record of what Taylor's and Belsha's scores would have been using the 2013 data. In fact, Taylor testified that she did not know what she would have scored on either question had she gone through the 2013 interview process.[77] (Dkt. 34:19.)

The court pointed out that the panel relied solely on Taylor's testimony that her profitability was significantly diminished by her loss of the RCI/STF site, but it is undercut by the record evidence. (Dkt. 34:19.) Taylor's net profit in 2011 at the RCI-STF site was 24%, but her net profit that same year at the Southern Wisconsin Center, a primarily non-prison site, was 23%.[78] So, even assuming she would not have had prison site business data to use in 2013, she still would have scored 4 points on question 6 (i.e., for having net profit between 20 and 24.99%).[79] (Dkt. 34:19.) And the panel recognized the uncertainty in Taylor's claim that prisons were more profitable. "The score on these two questions *might have* made a difference between Belsha and Taylor as to who scored the highest on the interview."[80] (Dkt. 34:19.) The court cited *Rapanos v.*

---

[77] Dkt. 21-1:68 (AR-000191–92).

[78] Dkt. 21-1:61, 227 (AR-000184; AR-350).

[79] A candidate could have scored a maximum of 6 points on question no. 6. Dkt. 21-1:310 (AR-000433).

[80] Dkt. 21-3:83 (AR-000850) (emphasis added)).

*United States*, 547 U.S. 715, 786 (2006), for the proposition that "conditional language" can "suggest an undue degree of speculation that renders an agency decision unsupported by substantial evidence." (Dkt. 34:19.)

### (2)    Greco's decision not to accept letters of recommendation.

Next, the court noted that the arbitration panel concluded that DWD's refusal to accept letters of recommendation was arbitrary and capricious because it did not follow the evidentiary hearing panel's recommendation.[81] But DWD explained in 2011 that it would not accept such letters because it had personnel records of the BEP operators and was quite familiar with the training and performance of each operator.[82] Since Taylor and Belsha were long-time operators, they were well-known to the BEP, so letters of recommendation were unnecessary. Because DWD's decision was grounded in reason, it was not arbitrary. (Dkt. 34:20.)

The court also explained that, while the panel believed that Taylor's letter of recommendation would counter the bias against her, it did not explain how. (Dkt. 34:20.) And the letter was very brief and without detail about Taylor's performance in any event,[83] and not fairly characterized as a "powerful asset" as the panel described it. (Dkt. 34:20–21.) Also, the court concluded that it was

---

[81] Dkt. 21-3:81 (AR-000848).
[82] Dkt. 21-1:295 (AR-000418).
[83] Dkt. 21-1:230 (AR-000353).

unreasonable for the panel to believe that Belsha would not have had any letters of recommendation if they were allowed for the 2013 re-interview. (Dkt. 34:21.) The panel's finding that Taylor's letter of recommendation would have had a significant effect on the permanent contract award process was "mere speculation," which does not meet the substantial evidence standard of review. (Dkt. 34:21.)

### (3) Greco's decision not to make Taylor the interim operator of the RCI/STF site.

The district court then tackled the panel's factual finding that DWD's decision to keep on Belsha as the interim operator of the RCI/STF site during the re-interview process was arbitrary and capricious. Greco explained that it would have been "unnecessarily disruptive" to appoint a different interim operator until the permanent one was selected. But the panel wanted more evidence, and also found that Taylor's past performance proves that someone could have taken over without disruption.[84] (Dkt. 34:21.) The court exposed the holes in the panel's reasoning.

First, the panel criticized Greco for not complying with the evidentiary hearing panel's recommendation but at the same time acknowledged that there was no recommendation as to an interim operator.[85] Second, while true that a

---

[84] Dkt. 21-3:80 (AR-000847).
[85] Dkt. 21-3:80 (AR-000847).

vendor could step in on short notice and run the RCI/STF site on an interim basis, a change in vendor would be disruptive to the vendors and the client institutions. Belsha was already there and installing a different operator would cause disruption. Greco's decision to keep Belsha on limited potential disruption; it was not arbitrary and capricious. (Dkt. 34:22.)

### (4) Delay between Greco's decision and the 2013 interview.

The court next addressed the panel's criticism of DWD for the delay between Greco's decision to order re-interviews and the date of those interviews because DWD gave no good reason.[86] The panel thought it was unfair to Taylor and severely harmed her. DWD's did provide a reason, however, and it was the requirement for it to obtain the participation of the Elected Committee in establishing the new benchmarks that the evidentiary hearing panel recommended. The court noted that ample evidence supports this.[87] (Dkt. 34:22–23.)

Regardless, even with the delay, the arbitration panel did not explain how this "made it difficult for Taylor to compete for the permanent operator position at RCI/STF."[88] The district court explained that, if the panel assumed that Belsha's running of the site would have built-up her profitability, thereby

---

[86] Dkt. 21-3:83–84 (AR-000850–51).
[87] Dkt. 21-1:315 (AR-000438).
[88] Dkt. 21-3:83 (AR-000850).

gaining a decision advantage over Taylor, there was no evidence of either of the operator's profitability in 2013. Thus, the panel was merely speculating, which, again, does not satisfy substantial evidence. (Dkt. 34:23.)

### c.   The arbitration panel's conclusions were arbitrary and remedies were improper.

The court then took issue with the arbitration panel's conclusion that Taylor was the best-suited operator for the RCI/STF site. The court concluded this to be arbitrary and capricious because "information about the competing vendors, particularly Belsha, was not in the record, and thus the panel could not reliably gauge the relative merits of the applications." (Dkt. 34:23–24.) And, in the view of the court, the blame for this lies with Taylor, who unreasonably decided not to participate in the 2013 re-interview process. Taylor thought the use of 2013 business date was unfair to her, but "she did not actually know whether this would pose any meaningful disadvantage, and she forfeited the opportunity to explain her profitability data at the interviews." Further, the court explained, at the arbitration "she did not adduce evidence that her 2013 profitability date was significantly different from her 2011 data." Thus, the panel's decision that Taylor was the best-suited operator is unsupported and "the panel's decision that Taylor should replace Belsha as the permanent operator of the RCI/STF site cannot stand." The court in turn set aside the panel's award of damages to Taylor. (Dkt. 34:24.)

28

Alternatively, the district court concluded that the arbitration panel's award of monetary damages against DWD (i.e., compensatory damages, attorney's fees, and costs) was barred by sovereign immunity. (Dkt. 34:25.) The court expressly adopted its analysis in one of its previous RSA decisions: *Wisconsin Dep't of Workforce Dev. v. United States Dep't of Educ.*, 667 F. Supp. 2d 1007 (W.D. Wis. 2009). (Dkt. 34:24.) It explained that the RSA did not contain unambiguous language putting the states on notice that by participating in the RSA Program they would be waiving their sovereign immunity from money damages awards. Therefore, the court held that, under Supreme Court and Seventh Circuit precedent, the panel's monetary award against the State of Wisconsin was impermissible.

### d.     The district court's remedies.

The district court vacated and reversed the decision of the arbitration panel and remanded the matter back the Department to confirm the award of the permanent contract to Belsha. (Dkt. 34:25.) Judgment was entered. (Dkt. 35.) However, ten days later, on December 20, 2019, the Department filed an unopposed motion to alter or amend the judgment. (Dkt. 37.) On January 7, 2020, the district court granted the motion and entered an amended judgment. (Dkt. 41–42.) The amended judgment differed from the original judgment only in that it did not include a remand order to the Department. (Dkt. 42.)

Taylor timely appealed to this Court.

## SUMMARY OF THE ARGUMENT

The federal arbitration panel's decision was properly set aside by the district court because its key factual findings are not supported by substantial evidence and its conclusions are arbitrary and capricious.

The panel convened an evidentiary hearing to address Taylor's grievance challenging DWD's vendor bid award process for the RCI/STF site. However, it exceeded its authority in going further by removing the permanent contract awarded to Belsha and awarding it to Taylor, when neither Belsha nor any of the other bidders participated in the arbitration. In addition, the panel granted Taylor the wrong burden of proof at hearing—an inapplicable "substantial evidence" standard rather than the customary preponderance of the evidence standard.

In turn, the panel's key findings of fact are not supported by substantial evidence in the agency record—the proper standard of judicial review of an agency decision. Most rely on mere speculation or were based on DWD not meeting a non-existent burden of proof in the law.

Also, the panel's conclusions, including that Taylor was the best-suited operator for the RCI/STF site and removing Belsha from the contract, are arbitrary and capricious. There was no evidence in the record about the merits of the bidders to allow the panel to make a sound decision, even apart from the

facts that Taylor did not participate in DWD's 2013 re-interview process and the other operator candidates were not parties to Taylor's grievance.

Finally, and alternatively, the panel's monetary damages award against the State is barred by sovereign immunity. The RSA does not include necessary unequivocal language for the states to knowingly waive their sovereign immunity when choosing to participate in the RSA program.

## STANDARD OF REVIEW

The Randolph-Sheppard Act directs the federal courts to review arbitration panel decisions under the Administrative Procedure Act (APA) standards. *See* 20 U.S.C. § 107d-2(a). "[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Relevant here, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [] contrary to constitutional right, power, privilege, or immunity; [or] unsupported by substantial evidence in a case." 5 U.S.C. § 706(2)(A), (B), and (E).

# ARGUMENT

## I. The district court properly set aside the decision of the federal arbitration panel.

### A. The ad hoc arbitration panel gave itself authority it did not possess.

The district court properly concluded that the arbitration panel's decision was based on improper authority. The panel impermissibly arrogated itself broad authority that it did not possess. (Dkt. 34:13–14.)

Taylor's grievance complained that DWD did not follow its process during the bid award selection for the RCI/STF site. The full evidentiary hearing panel recommended that the process be run again in compliance with DWD's rules, including with new selection criteria. DWD implemented, almost in full, the panel's recommendations. Taylor disagreed with that action (e.g., use of 2013 financial data and no letters or recommendation permitted) and filed a complaint against DWD with the Department. At the same time, the selection process for the RCI/STF site went forward. For her own reasons, Taylor chose not to participate in that process. Her decision not to participate resulted in the permanent contract being awarded to another operator, Belsha. The ad hoc arbitration panel would eventually arbitrate the dispute between DWD and Taylor.

The arbitration panel had no jurisdiction or authority to conduct the selection process for the RCI/STF site on its own. That was DWD's authority.

*See* Wis. Admin. Code DWD §§ 60.08 ("The [DWD] shall select operators for business enterprises from among persons licensed to operate business enterprises."), 60.02(8). And that process occurred in 2013, despite Taylor's choice not to participate.. The federal ad hoc arbitration panel cited no legal authority in its decision permitting it to usurp DWD's authority to select an operator for a BEP site, especially without the participation of the other bidders. But that is exactly what happened here. The panel's failure to consider this "important aspect of the problem" led the court to correctly conclude the panel's ultimate decision was arbitrary and capricious. (Dkt. 34:13–14.)

Taylor criticizes the district court's holding. She audaciously asserts that, under the APA, Belsha could have participated in the arbitration if she wanted. (Taylor's Br. 29.) Given that the panel was convened based on *Taylor's* complaint, it is doubtful Belsha could have intervened and Taylor cites no law that Belsha was *required* to participate, in any event. Nonetheless, what is certain is this: Taylor could have participated in the 2013 bid award re-interviews if she wanted, just as Belsha did. But Taylor did not. And that failure sinks her argument.

Taylor's citation to *Tyler v. United States Dep't of Educ. Rehab. Servs. Admin.*, 904 F.3d 1167 (10th Cir. 2018), *cert. denied sub nom. Altstatt v. Fruendt*, 139 S. Ct. 1214 (2019), is unhelpful to her position. (Taylor's Br. 30.) While the federal arbitration panel in *Tyler* did order the SLA to remove a

vendor from an assignment and put another in his place, unlike here, *both vendors* applied for the assignment. *Id.* at 1170. Taylor cannot say the same, due to her refusal to participate in the 2013 re-interviews with DWD. Thus, *Tyler* is therefore inapposite and does not stand for the proposition Taylor claims it does.

But even if Belsha (and the other blind vendors) could have participated in the arbitration, Taylor points to no evidence that notice was ever given to Belsha that the panel was considering removing the permanent contract from her and awarding it to Taylor. Notice is a due process requirement. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49 (1993) (due process general rule is individuals must receive notice and an opportunity to be heard before the government deprives them of property). Furthermore, this Court has held that, in arbitration, "third parties' rights may be affected only with their consent." *Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 666 (7th Cir. 2009). And contrary to Taylor's contention, the district court did cite case law supporting its decision that the arbitration panel's failure to consider the other bidders' rights render its decision arbitrary and capricious. (Dkt. 34:14 (citing *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (a decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem.")).

Under the APA standard of review, a federal court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The ad hoc arbitration panel exceeded its statutory authority in selecting an operator for a BEP site. This is a foundational problem in the panel's decision and one basis, of many, on which this Court can affirm the district court.

### B.  The arbitration panel erred in setting Taylor's burden of proof as substantial evidence rather than preponderance of the evidence.

The arbitration panel's decision errs because of another foundational problem: Taylor was not required to prove her case under the required preponderance of the evidence standard. Instead, the panel permitted her an inapplicable substantial evidence standard. (Dkt. 34:14.)

Taylor claims that she did not have to prove her case under a preponderance of the evidence burden of proof. (Taylor's Br. 14.) She is undoubtedly wrong. Taylor confuses a party's burden of proof at an evidentiary hearing with a court's legal standard of review of an administrative agency's factual finding.

The party with the burden of proof at an agency evidentiary hearing must prove her case under a preponderance of the evidence standard. The provision of the APA that Taylor cites—5 U.S.C. § 556(d)—expressly states that "the proponent of a rule or order has the burden of proof." And the Supreme Court's

interpretation of that provision supports DWD's position (and the district court's holding). In *Steadman v. SEC,* 450 U.S. 91 (1981), the Court "held that the proponent of a rule or order under § [556(d)[89] *had to meet its burden by a preponderance of the evidence*, not by clear and convincing evidence." *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 277 (1994) (emphasis added). *See also Sea Island Broadcasting Corp. v. FCC,* 627 F.2d 240, 243 (D.C. Cir. 1980) ("The use of the 'preponderance of evidence' standard is traditional standard in civil administrative proceedings; it is the one contemplated by the Administrative Procedure Act."). And, since *Steadman* and *Greenwich Collieries*, this Court has confirmed that 5 U.S.C. § 556(d) means that the burden of proof on the party seeking an order at an agency hearing—here, Taylor—is preponderance of the evidence. *See Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847–48 (7th Cir. 2016) ("As a matter of administrative law, the proponent of a position bears the burden of showing entitlement by a preponderance of the evidence.").

The district court properly concluded that Taylor's burden of proof at the arbitration hearing was preponderance of the evidence and, thus, the

---

[89] This decision referenced "§ 7(c)" of the APA, later codified as 5 U.S.C. § 556(d). *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 277 (1994).

arbitration panel fundamentally erred in giving her an inapplicable (and lesser) standard. This fundamental error resulted in, as the district court described it, the flipping of the burden onto DWD. (Dkt. 34:15.) For example, the panel faulted DWD on two occasions for failing to adduce evidence to support the explanation of its decisions, despite Taylor having the burden. The panel stated that there was no evidence to support Greco's decision that it would be disruptive to remove Belsha as interim operation[90] and no evidence to support DWD's claim that it was familiar with Taylor and Belsha as operators.[91] (Dkt. 34:15.) Moreover, the panel's hedging that Taylor would meet a preponderance of the evidence standard if applicable was not explained at all. (Dkt. 34:15–16.) And its factual findings—not being supported by substantial evidence—shows that the reference was mere lip service to the preponderance of the evidence standard, as explained further below.

As Taylor correctly acknowledges, the RSA requires that the arbitration panel conduct a hearing "in accordance with the provisions of subchapter II of chapter 5 of Title 5." (Taylor's Br. 15–16.) But her argument goes off track when she cites 5 U.S.C. § 556(d) for the proposition that she had a substantial evidence burden of proof at the evidentiary arbitration hearing. (Taylor's Br. 16.) This APA statutory provision states, in part, that no order may be

---

[90] Dkt. 21-3:80 (AR-000847).
[91] Dkt. 21-3:81 (AR-000848).

issued "except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). This provision does not support her assertion.

Notably, Taylor fails to cite even one court decision interpreting 5 U.S.C. § 556(d). Instead, she merely cites a district court decision describing substantial evidence as "the kind of evidence a reasonable mind might accept as adequate to support a conclusion." (Taylor's Br. 16 (*citing Stachan Shipping Co. v. Shea*, 276 F. Supp. 610, 613 (S.D. Tex. 1967).) Then, she cites another district court decision, *Broecker v. Sullivan*, 751 F.Supp. 1361, 1362 (W.D. Wis. 1990), that simply states the customary substantial evidence standard of judicial review of agency factual findings: courts look to the record as a whole to determine whether agency factual findings are supported by substantial evidence. *Broecker* also merely repeats the aforementioned common notion that "[s]ubstantial evidence means such relevant evidence a reasonable mind might accept as adequate to support a conclusion." 751 F. Supp. at 1362 (citing *Whitney v. Schweiker,* 695 F.2d 784 (7th Cir. 1982)).

On judicial review under the APA, a court sets aside an agency decision that is "unsupported by substantial evidence in a case." 5 U.S.C. § 706(2)(e). Taylor's aforementioned citations to district court case law merely confirms this is the standard of judicial review of agency factual findings. Her citations

do not support a "substantial evidence" burden of proof standard for a party at an evidentiary hearing.

Under the APA, a federal court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The arbitration panel did not observe the required procedure for conducting evidentiary hearings. This second foundational problem in the panel's decision provides yet another basis on which this Court can affirm the district court.

## C. The panel's key findings of fact are not supported by substantial evidence.

As discussed above, the arbitration panel accorded an inappropriate and lesser burden of proof upon Taylor at the evidentiary hearing. This error infects all of its factual findings. The district court correctly concluded that the panel's key findings are not supported by substantial evidence and should be set aside. (Dkt. 34:15–16.)

### 1. The substantial evidence standard.

This Court has defined "substantial evidence," to mean "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion" reached by the agency. *Zero Zone, Inc. v. United States Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016).

### 2. The panel's finding that DWD was biased against Taylor is not supported by substantial evidence.

Contrary to Taylor's assertion, there is not substantial evidence in the record to support the panel's factual finding that DWD was relentlessly biased against her. (Taylor's Br. 25–26.)

Taylor points to Feypel's acts and words before and during the 2011 interview process, in which she claims he implied that Belsha should be awarded the contract because her UW-Parkside site was not profitable. (Taylor's Br. 24, 26.) But any inference that Feypel was biased against Taylor and in favor of Belsha is belied by the fact that he gave Taylor and Belsha identical scores of 33 points at the 2011 interview.[92]

Moreover, the 2011 interview process became irrelevant because of the 2013 re-interviews.[93] Taylor does not explain how what Feypel said prior to or during 2011 interviews were material to the selection process in 2013—which was carried out with an entirely new panel and with new standards (as described further below). All Taylor relies on is the meaningless point that she raised the issue of the 2011 interview in her original complaint to the Department, filed before the 2013 re-interview process. (Taylor's Br. 24–25.)

---

[92] Dkt. 21-1:289 (AR-000412).

[93] Taylor complains about DWD not following policies for the 2011 interviews for the RCI/STF site. (Taylor's Br. 17–18.) This assertion is completely irrelevant because the 2011 interviews are completely irrelevant. The full evidentiary hearing panel recommended, and Greco later adopted, that the 2011 interviews be re-done, and they were.

Addressing her claim of bias, the district court found that BEP Director Lang's clear testimony rebutted Taylor's mere allegation that DWD considered "social need" in awarding vending contracts—implying that Belsha was to be helped.[94] Taylor focuses on Lang's testimony that she was not knowledgeable about the existence of the 2010 policy, but she does not explain why or how this would be relevant, given the new 2013 policy on which the re-interviews were conducted (and for which Taylor chose not to participate).

The district court rightly decided that the panel's finding that DWD was biased against Taylor has no support in substantial evidence. (Dkt. 34:16.)

### 3. The panel's finding that Taylor was disadvantaged by the 2013 selection criteria is not supported by substantial evidence.

The arbitration panel found that Taylor would have been disadvantaged in the 2013 selection process compared to Belsha, because Taylor's profit margins in 2013 were lower than they would have been in 2011, when she had been interim operator of the RCI/STF site.[95] That is because, according to Taylor, prison sites (e.g., RCI/STF) are more profitable. But because Taylor's testimony

---

[94] Taylor also references minutes of a meeting of the Elected Committee from 2011 that discussed the goal of everyone to increase the profitability of each operator. (Taylor's Brief 26.) She does not explain how a goal of this non-DWD committee supports bias *by DWD*.

[95] Dkt. 21-3:83 (AR-000850).

is undercut by the record evidence, the district court properly concluded that this finding does not meet the substantial evidence standard. (Dkt. 34:18–19.)

The only aspect of the process that considered the vendor applicants' profitability data was the fifth and sixth questions in the performance component section of the 2013 selection criteria. (Dkt. 34:18.) Question no. 5 read: "Operator cost of goods sold percentage." It awarded 3 points for 0%–40%, 2 points for 40.01%–50%; and 1 point for greater than 50.01%.[96] Taylor testified at the arbitration hearing that she *did not know* what she would have scored on this performance review question had she participated in the 2013 selection process.[97] Thus, there is no substantial evidence that Taylor was disadvantaged by question no. 5.

Question no. 6 stated: "Operator net profit percentage prior to commissions and/or rents to state agencies," for vending only. The question awarded 6 points for greater than 25%, 4 points for 20%–24.99%, and 2 points for 0%–9.99%.[98] Like her answer to question no. 5, Taylor testified that she *did not know* what she would have scored on performance review question 6. And there was no profitability data for Belsha to which Taylor could even be compared. The

---

[96] Dkt. 21-1:310 (AR-000433).
[97] Dkt. 21-1:67–68 (AR-000190:21 – AR-000191:11).
[98] Dkt. 21-1:310 (AR-000433).

court, therefore, correctly found no evidence in the record of what Taylor's and Belsha's scores would have been using the 2013 data. (Dkt. 34:19.)

Nonetheless, Taylor testified at the arbitration hearing that, had she interviewed, she would have been able to answer question no. 6.[99] In Taylor's summary of a proposal she sent to Feypel (that she submitted as an exhibit), Taylor estimated her average profitability at the Southern Wisconsin Center site was 23% in 2011.[100] When she bid in 2011, Taylor's profitability percentage for RCI/STF and RYOCF was 24%.[101] This shows that, contrary to her assertion, prison sites are *not* significantly more profitable than other kinds of sites. But most importantly, this evidence shows that Taylor would have scored 4 (out of 6) points on question no. 6, regardless of having a prison site or not. That is, her 2011 profitability data—when she had the RCI/STF prison site— was not significantly better than any 2013 profitability data even without a prison site. Further, the selection criteria also provided that in the event of a tie, the operator with greater seniority would be awarded an extra point. Taylor testified that Belsha would have greater seniority because she has been an operator for close to 30 years.[102] Hence, the district court was right in concluding that the differences in profit margins would have had minimal (if

---

[99] Dkt. 21-1:68–69 (AR-000191:12 – AR-000192:6).
[100] Dkt. 21-1:227–27, 29–30 (AR-000350-51; AR-000152:3 – AR-000153:9).
[101] Dkt. 21-1:61(AR-000184:14–21).
[102] Dkt. 21-1:69 (AR-000192:7–12).

any) impact on the candidates' total scores and the 2013 selection process did not significantly harm Taylor.[103] (Dkt. 34:18–19.)

This key finding of fact by the arbitration panel was not supported by substantial evidence.

### 4. The panel's finding that Taylor's letter of recommendation would have had a significant effect on the permanent contract award process is not supported by substantial evidence.

The district court also properly concluded that the arbitration panel's finding that Taylor's letter of recommendation would have had a significant effect on the permanent contract award process is "mere speculation," which does not meet the substantial evidence standard of review. (Dkt. 34:21.)

Pomeroy explained in 2011 that DWD would not accept letters of recommendation because it had access to personnel records of the BEP operators and was quite familiar with the training and performance of each operator.[104] Since Taylor and Belsha were long-time operators, they were well-known to the BEP, so letters of recommendation were unnecessary. In addition, Redd's letter was very brief and did not contain much detail about

---

[103] Again, a candidate could score a maximum of 6 points on question no. 6. (Taylor likely would have scored 4 if she had interviewed.) And a candidate participating in the overall selection process could score a maximum of 100 points. Dkt. 21-1:308–310 (AR-000431–33).

[104] Dkt. 21-1:295 (AR-000418).

her performance anyway.[105] Moreover, as the district court noted, it was unreasonable for the panel to believe that, if permitted, Belsha and the other operator candidates would not have produced recommendation letters to help their own causes if Taylor were allowed to submit such a letter. (Dkt. 34:21.)

DWD's decision not to permit the vendor candidates to submit letters of recommendation during the 2013 selection process did not significantly harm Taylor. The panel's finding that it did is based on pure speculation, which cannot survive a substantial evidence standard of review.

> **5.   The panel's findings regarding the delay between Greco's decision and the 2013 re-interviews, and alleged consequential harm to Taylor, are not supported by substantial evidence.**

The panel criticized DWD for providing no good reason or explanation for the delay between its final decision implementing most of the full evidentiary hearing panel's recommendation and the actual June 2013 re-interviews. It also found that this delay harmed Taylor. The district court appropriately concluded that these factual findings are not supported by substantial evidence in the record.

The delay occurred because DWD had to comply with its duty to seek the active participation from the Elected Committee of Blind Vendors to establish the new selection criteria, in accordance with Greco's final decision. Wis.

---

[105] Dkt. 21-1:230 (AR-000353).

Admin. Code DWD § 60.03. Contrary to the arbitration panel's finding, there is evidence in the record to explain this delay.[106] Had DWD developed new selection criteria without the active participation of the Elected Committee, it likely would have violated the RSA and implementing regulations. *See, e.g., Comm. Of Blind Vendors v. District of Columbia*, 736 F. Supp. 292, 309 (D.D.C. 1990) (noting that the failure to allow for the Committee's active participation and ignoring its protests and concerns violated the Randolph-Sheppard Act), *rev'd on other grounds*, 28 F.3d 130 (D.C. Cir. 1994); *Maryland State Dept. of Education v. United States Dept. of Education*, Case No. CCB-17-1383, 2018 WL 4604305 (Sept. 25, 2018) (stating had the agency chosen to ignore the Committee's recommendation to revise and rebid the solicitation, it may well have been violating the State regulations and the Randolph-Sheppard Act). And in any event, neither the RSA nor DWD implementing regulations have a time limit for when candidate interviews on bids are to be conducted.

Also, the arbitration panel's finding that Taylor was harmed because of this delay—that it "made it difficult for Taylor to compete for the permanent operator position at RCI/STF"—has no evidentiary support. To the extent the panel assumed that Belsha's position as interim operator would give her an

---

[106] Dkt. 21-1:315 (AR-000438).

advantage over Taylor because RCI/STF is a prison site and prison sites are more profitable, that assumption has no evidentiary basis as explained above. (Dkt. 34:22.) Speculation does not meet the substantial evidence standard.

The panel's finding that DWD's delay harmed Taylor is not supported by substantial evidence and cannot be confirmed.

### D.     The panel's conclusions are arbitrary and capricious.

In addition to factual findings not supported by substantial evidence, the arbitration panel's decision is also deficient because its conclusions are arbitrary and capricious.

#### 1.     Arbitrary and capricious standard.

When determining whether an agency decision is arbitrary or capricious, a reviewing court considers whether the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," among others. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43) (internal quotation marks omitted).

#### 2.     The panel's conclusions that Taylor was the best-suited operator for the RCI/STF site and to replace Belsha with Taylor were arbitrary and capricious.

As explained above, the panel's conclusion that Taylor was the best-suited operator for the RCI/STF site violated the rights of the third-party vendor

candidates. It is also arbitrary and capricious because the information about those competing vendors, especially Belsha, was not in the evidentiary record. There was no way the panel could "reliably gauge the relative merits of their applications." (Dkt. 34:23–24.)

Also, as the district court noted, Taylor chose not to participate in the 2013 re-interview and that decision was unreasonable. Despite her belief that "the use of 2013 data was unfair to her," "she did not actually know whether this would pose any meaningful disadvantage, and she forfeited the opportunity to explain her profitability data in the interviews."  (Dkt. 34:24.) And even at the arbitration she did not show that 2013 profitability data would have been much different than her 2011 data. The district court succinctly put it: "Taylor's choice prevented DWD from considering her application, and it foreclosed the possibility that the arbitration panel would have a record that would show how Taylor's application compared to those of the competing applicants." (Dkt. 34:24.) The district court appropriately set aside the arbitration panel's decision because it was arbitrary and capricious. *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Taylor argues that DWD presented no evidence that Belsha was better suited than her to operate the RCI/STF site. (Taylor's Br. 29.) This statement shows Taylor's misunderstanding of the arbitration. DWD had no burden to prove that Belsha was better suited. Taylor was the party seeking an order

48

from the panel, so she had the burden of proof. *See* 5 U.S.C. § 556(d); *Greenwich Collieries*, 512 U.S. at 277. DWD had already awarded Belsha the permanent contract because she had participated in the entire 2013 selection process while Taylor had not. Taylor's complaint to the Department did not require DWD to prove that Belsha was the best-suited operator for the RCI/STF site or permit the ad hoc arbitration panel to perform a de novo selection process over which DWD has sole authority.

Taylor also complains that Greco did not fully follow the state evidentiary hearing panel's recommendations. She asserts that, despite the panel setting aside Belsha as operator of the RCI/STF site, Greco kept her on during the re-interview process. (Taylor's Br. 23.) Notwithstanding that these were mere recommendations not directives, Greco kept Belsha on only as *interim* operator during the 2013 re-selection process.[107] Not until after the conclusion of that process did Belsha become permanent operator.

Taylor further argues that Greco's final decision did not comply with Wisconsin law because it did not contain findings of fact and conclusions of law. (Taylor's Br. 22–23.) This is an argument that Taylor raises for the first time in the federal courts. "It is well-established that a party waives the right to argue an issue on appeal if he fails to raise that issue before the trial

---

[107] Dkt. 21-1:306 (AR-000429).

court." *Hale v. Victor Chu*, 614 F.3d 741, 744 (7th Cir. 2010). Because Taylor did not raise this argument in any of her briefs before the district court, it is too late to raise it for the first time now. This Court may disregard Taylor's argument. Regardless, the federal ad hoc arbitration panel's decision is under review here, not DWD's final decision. None of Taylor's arguments have merit.

*** 

The district court's decision setting aside the federal arbitration panel's decision was correct because its key findings of fact are not supported by substantial evidence and its conclusions are arbitrary and capricious. Taylor has not shown otherwise. This Court should affirm.

## II.    Alternatively, the State of Wisconsin is immune from the arbitration panel's monetary damages awards.

Even assuming, arguendo, that the arbitration panel's decision was proper, its order awarding Taylor compensatory damages, attorney's fees, and costs against the State of Wisconsin cannot stand. Supreme Court precedent holds that the Eleventh Amendment applies to administrative agency proceedings and that Congress must include unambiguous waiver language in statutes to give proper notice to states participating in federal programs. The RSA contains no such language. Therefore, the district court was right; the arbitration panel's monetary damages award against the State is barred by its sovereign immunity. (Dkt. 34:24–25.)

Although the Eleventh Amendment recognizes the states' sovereign immunity, the Supreme Court "has repeatedly held that the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment." *Federal Maritime Comm'n v. South Carolina Ports Authority,* 535 U.S. 743, 754 (2002). "[F]ederal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana,* 134 U.S. 1, 15 (1890). "Sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98 (1984). This immunity extends to administrative proceedings commenced by private parties. *Federal Maritime Comm'n,* 535 U.S. at 760 (finding that federal administrative proceedings are "the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union"). "Immunity from private suits has long been considered 'central to sovereign dignity.'" *Sossamon*, 563 U.S. at 283 (quoting *Alden v. Maine,* 527 U.S. 706, 715, (1999). For instance, "state sovereign immunity serves the important function of shielding state treasuries." *Federal Maritime Comm'n,* 535 U.S. at 765. "A State, however,

may choose to waive its immunity in federal court at its pleasure." *Sossamon*, 563 U.S. at 284 (2011).

The Supreme Court's "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 675 (1999) (citation omitted). "A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute." *Sossamon*, 563 U.S. at 284 (2011) (quoting *Pennhurst State Sch. & Hosp.*, 465 U.S. at 99). "Waiver may not be implied." *Sossamon*, 563 U.S. at 284 (2011). "Only by requiring this 'clear declaration' by the State can [courts] be 'certain that the State in fact consents to suit.'" *Id.* (quoting *College Savings Bank,* 527 U.S. at 680. "For these reasons, a waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Id.* at 285 (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)).

Taylor criticizes the district court's conclusion that the State can waive its immunity from participation in federal arbitration panels but not waive its immunity to monetary damages ordered by that panel.[108] (Taylor's Br. 30–31.) She argues that by consenting to participate in the RSA program, the State of Wisconsin has waived its sovereign immunity to all forms of relief, including

---

[108] DWD raised the defense of sovereign immunity to damages at the arbitration panel hearing. (Dkt. 21-1:13–14 (AR-000136–37).)

monetary damages. She also claims that any monetary damages are appropriate because any form of relief is proper through arbitration. (Taylor's Br. 31–32.) To her, waiver is an all-or-nothing proposition here. The theme of her arguments is that there does not need to be any unequivocal language in the RSA waiving the states' sovereign immunity to money damages. She is mistaken.

A recent Supreme Court decision forecloses her argument. In *Sossamon v. Texas*, an inmate sued Texas officials in their official capacities for injunctive and monetary relief alleging that two prison policies violated the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). 563 U.S. at 283. The Supreme Court had to decide whether the states waived their consent to suits for money damages by private persons through acceptance of federal funds. *Sossaman*, 563 U.S. at 280. This specific federal statute simply authorized "appropriate relief against a government." *Id.* The Court determined that the states did not waive their sovereign immunity to money damages. *Id.*

The Court first noted that its precedent teaches that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages." *Id.* at 285. That is, "the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Id.* (quoting *Lane,* 518 U.S. at 192) (citing *United States v. Nordic Village, Inc.,* 503 U.S. 30 (1992) (construing an ambiguous

waiver of sovereign immunity to permit equitable but not monetary claims)). Next, in reviewing the RLUIPA text, the Court held that it was "not the unequivocal expression of state consent that [its] precedents require." *Id.* at 285. "[A]ppropriate relief against a government" does not mention monetary damages, *see id.* at 286, and, in the context of a proceeding against a sovereign state, monetary damages are not proper or suitable, *id.* at 287. The Court further stated, "Where a statute is susceptible of multiple plausible interpretations, including one preserving immunity [from monetary damages], we will not consider a State to have waived its sovereign immunity." *Id.*

Here, the RSA includes *no express language* that would purport to waive the states' sovereign immunity to monetary damages by a state choosing to participate in the program—and Taylor notably points to none. Thus, the *Sossamon* decision rejects all of Taylor's arguments. That is, the absence of unequivocal statutory language waiving monetary damages awards forecloses her arguments that participation in the program—and arbitration—is sufficient for waiver of immunity; it is not.

The district court recognized this lack of unequivocal language by its express adoption of its reasoning in an earlier RSA case—*Wisconsin Dep't of Workforce Dev. v. United States Dep't of Educ.*, 667 F. Supp. 2d 1007 (W.D. Wis. 2009). (Dkt. 34:24.) In that earlier decision, the district court explained that the "Randolph-Sheppard Act requires states to agree to consent

to resolving disputes by arbitration proceedings as a condition of their participation in the program." *Wisconsin Dep't of Workforce Dev.*, 667 F. Supp. 2d at 1015. But agreeing to arbitration "does not mean that they are required to submit to awards of money damages." *Id.* It merely "means that states can be found liable for violations of the Act and subject to some form of relief." *Id.* The court reasoned: "States should not be held subject to damage awards that could expose them to potentially significant financial liability without being fully and clearly informed of this possibility." *Id.*

Other circuit courts of appeal agree. In fact, the Tenth Circuit Court of Appeals, in an on-point decision concerning the RSA and money damages, cited with approval the district court's decision in *Wisconsin Dep't of Workforce Dev*. In *Tyler v. United States Dept. of Ed.*, 904 F.3d 1167 (10th Cir. 2018), the court held that sovereign immunity extends to RSA arbitration panel proceedings. The court, citing *Sossaman*, 563 U.S. at 286, explained that the RSA "does not expressly enumerate the types of remedies available to private parties aggrieved by a state." *Tyler,* 904 F.3d at 1193. Because the RSA "is silent as to what remedies aggrieved vendors may obtain," it is just as "open-ended and ambiguous" as RLUIPA, if not more. *Id.* It then concluded that the RSA is "insufficiently explicit to render state participation in the [ ] [p]rogram a waiver of sovereign immunity from an [ ] arbitration panel award for damages." *Id.*

*See also New Hampshire v. Ramsey*, 366 F.3d 1, 21-22 (1st Cir. 2004) (holding that states are not subject to damages awards under the RSA).

In support of her position, Taylor cites *Premo v. Martin*, 119 F.3d 764 (9th Cir. 1997), which allowed the award of monetary damages by RSA arbitration panels. But the Tenth Circuit rejected *Premo*'s holding that the Eleventh Amendment does not apply to arbitration panel hearings because of the Supreme Court's subsequent contrary holding in *Federal Maritime Comm'n*. *See Tyler*, 904 F.3d at 1192. And the district court here recognized that *Premo* is no longer good law after *Sossamon*. (Dkt. 34:24–25.) Taylor also cites *Delaware Dep't of Health & Soc. Servs., Div. for Visually Impaired v. U.S. Dep't of Educ.*, 772 F.2d 1123, 1136–37 (3d Cir. 1985), but that Third Circuit decision is even older than *Premo*. Taylor argues that *Sossamon* "cannot be binding precedent." (Taylor's Br. 31 n.202.) However, simply because *Sossamon* was a case about RUIPLA and not the RSA does not mean this Court can, or should, close its eyes to that decision's reasoning and holding.

Taylor's argument that sovereign immunity does not bar the arbitration panel's award of monetary damages is not grounded in current, binding

precedent.[109] The district court's alternative holding that such an award is barred is correct.

## CONCLUSION

Plaintiff-Appellee State of Wisconsin asks this Court to affirm the final decision of the district court and its amended judgment.

Dated this 5th day of June 2020.

<div style="margin-left: 40%;">

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452

Attorneys for State of Wisconsin DWD

</div>

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792
(608) 267-2223 (Fax)
kilpatricksc@doj.state.wi.us

---

[109] Taylor appears to make a separate argument to allow the panel's award of attorney's fees and costs to stand. (Taylor's Br. 32.) But there is no textual basis for an award of attorney's fees and costs against the states under the RSA, apart from sovereign immunity. The general rule is that parties pay their own attorney's fees—the American rule—unless they can point to a specific law that allows fee shifting. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247–49 (1975). The RSA contains no language supporting an award of attorney's fees to a prevailing party and Taylor points to none. The arbitration panel exceeded its legal authority when it awarded attorney's fees and costs to Taylor. *See Tyler*, 904 F.3d at 1194 ("The RSA is thus insufficiently explicit to authorize arbitration panels to award attorney fees to aggrieved blind vendors who prevail in arbitration against their SLA.")

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 12588 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 5th day of June 2020.

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General


**CERTIFICATE OF SERVICE**

I certify that on June 5, 2020, I electronically filed the foregoing *Response Brief of Appellee of State of Wisconsin* with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 5th day of June 2020.

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General